Consolidated. Argument not to exceed 15 minutes per side. Ms. Bailey, you may proceed for the appellant. Thank you. May it please the Court, Donna Bailey for the appellant. I'd like to reserve 5 minutes for rebuttal. Your Honors, I think it's important to split the plaintiff's claims in half between the claims that occurred before he signed the last chance agreement versus the claims that arose and occurred after. With respect to the claims that arose before he signed the last chance agreement in July of 2017, the appellee is arguing that he waived those rights in the last chance agreement. And my position is that it was an annoying involuntary waiver based on the factors of this court set forth in Nicklin v. Henderson. When you look and analyze those factors, the first one being his education and experience. My client was not a lawyer. My client was not experienced with bringing multiple claims for employment discrimination under Title VII. He had a bachelor's degree in art and healthcare, something totally unrelated to this. Well, you wouldn't have to be a lawyer or even have a legal education to be able to say that you are well enough educated to understand some of these proceedings, though, would you? I think to a certain extent you do, Your Honor. And that's evident by the fact that in the last chance agreement, it specifically said that he was waiving his rights to bring any claims concerning his employment. And three days later, he went to the EEOC and filed a claim concerning his employment. That in itself helps you to understand that he did not know what he was signing and a lot of plaintiffs don't. And I think it's about time, Your Honor, that the courts look at this from the standpoint of an employee. Going to college and getting a degree in engineering or art or healthcare does not make you a lawyer. But then when they sign these agreements, we walk them into court and say, well, hey, why didn't you understand what you were signing? And then they didn't give him a chance, which is the second factor, time to consult with a lawyer. They brought him back to work and said sign it this day or you don't get your job back. They didn't say you can take it and sit on it for a couple of weeks or consult with a lawyer and come back. Nobody sat in a meeting and explained the specific terms of the agreement and highlighted this includes your claim for race discrimination for the June meeting that you're complaining about. None of that was done. Did he have someone from the union with him during this meeting? Yes, who was also not a lawyer and did not explain that this meant that he would not be able to file a charge for discrimination against Coca-Cola for the very meeting that he was complaining about. All he did was tell him about the union contract and whether or not he would or would not be able to file a grievance, which is different. This is a Title VII claim that my client was trying to assert. Nobody in those meetings explained to him that he was waiving his rights to file a race discrimination and retaliation claim concerning this June meeting where he was fired. Not the supervisor, not the union steward, and he didn't know. Based on the totality of the circumstances, your honors, I'm saying that it wasn't a knowing and voluntary waiver. He was threatened with his job. The appellee is saying, well, that's not economic duress. Well, your honors, then what is? If your livelihood being threatened if you don't sign an agreement is not economic duress, then we have a test that no one can pass. What is your best case to support your position? My best case to support my position is based on the five factors that the court has required to analyze this under. My client was not educated in the law. No one explained it to him. He didn't have time to consult with a lawyer, and he only signed under the threat of not being able to get his job back. So is there a particular precedential case that we should look at? No, because, your honor, the case law says you're supposed to evaluate each case based on the facts and individual circumstances of it. So there shouldn't be a specific case that I have to fit my client's circumstance into. The court is supposed to evaluate those factors and identify the specific facts in my case and how those factors apply to my client's case, your honor. And so my last point on that being that regardless, the claim that occurred before the LCA concerning the June meeting is only a termination for about three weeks. And so while it's important, the crux of my client's claims is about the discrimination in the selective enforcement of the drug policy, which happened after the LCA. And so I'll go to that in a minute. Going back to the claims before he signed the LCA that they're claiming are waived, in their brief they make some nonsensical argument that my client didn't exhaust his administrative remedies. But he was fired in June of 2017 for allegedly using profanity and being insubordinate and trying to encourage a work stoppage in this meeting. And his EEOC charge, which is in the record document number 79, specifically is about that termination. So he clearly did exhaust his administrative remedies. So I'm not clear on what that argument is about. There's no support for it. The other issue is he did establish a prima facie case for race discrimination. In the meeting, they claim that he was trying to encourage a work stoppage and he was fired for using profanity. But in the record, we show other white employees were in the meeting and were actually being disruptive and were cursing and using profanity and refusing to do what the supervisor was asking. And that, in fact, it was my client that was trying to encourage his coworkers to just comply with the supervisor's request. We've got evidence in the record with affidavits from other employees that were present that said, no, he was not trying to encourage a work stoppage. He was actually trying to get everybody to do the opposite and go to work and do their job and comply with the supervisor's new directive. And so their explanation for termination is not grounded in fact. So now I want to move to the claims that occurred after July 14th. What I'm trying to show there, comments you just made, is that as the burden shifted as to whether a prima facie case of discrimination was made out, that the reason for your client's termination was pretextual because of the comparative treatment of white versus black employees. Is that argument one that goes to the issue of pretext when the employer had a reason for terminating Mr. Moore, his alleged instigation of a work stoppage and his positive drug testing? So once the employer gives a reason, a credible reason, then the burden shifts back to your client to say that that's pretextual. So the comparison of treatment between white and black employees, is that the pretext issue that you're addressing with that? For which claim are you asking, Your Honor, for the claims for the June 2017 meeting that were involved before he signed the LCA or after? I'm talking about the ultimate termination of your client. Well he was terminated twice, Your Honor. So in 2017, my pretext argument is that it's not grounded in fact. Because in 2017 when he was terminated, they claimed it was because he encouraged a work stoppage. But in the record I submitted affidavits from my client and three other witnesses that that never happened at all. So my pretext argument for that claim is that it's not grounded in fact. My pretext argument for the termination of his employment for the positive drug test in July of 2018 is that number one, if a positive drug test is grounds for, is not really grounds for termination and didn't motivate them to terminate my client. Because you have a white employee, Larry Voss, who failed his drug test in May of 2017 and he was not fired. So if a positive drug test is grounds for termination, then you've got white employees that weren't fired for the exact same thing. So the question becomes, did that really motivate them to terminate my client or was it really his race? The other issue is they claim that he was drug tested and put on a second chance agreement because he had an accident. But in the record we have three white employees that were also in workplace accidents, including Wyrm, who came to work drunk, stumbled, fell, paramedics had to be called, there was blood everywhere, it was a work stoppage for over an hour, no drug test for him. The other explanation they gave for my client getting fired was that he was randomly drug tested pursuant to his SCA. But again, we have a white employee that had a second chance agreement for two years and wasn't drug tested randomly at all. Those SCAs are identical and required the same thing to be done and they weren't. So the question becomes, their explanations are a mere pretext because you've got white employees going through the same exact thing that were not fired, were not drug tested and held to the same standard. And so it questions what their real motivation was for terminating my client. Thank you. Good afternoon, may it please the court, my name is Pam Palmer and I represent the appellee defendant, Coca-Cola Consolidated Incorporated. Our position is that the district court determined that there was not a genuine dispute of fact regarding whether Moore was discriminated against. Based on his race retaliation and that he abandoned his intentional infliction of emotional distress claim by failing to argue that claim within the briefing. As counsel has stated, I think it is correct to sort of separate this case into two parts. Moore was represented by the union at all times. The International Brotherhood Teamsters Union is one of the largest unions. At the specific time where there was a meeting in June of 2017, Moore was giving some commentary in that meeting regarding whether certain products should be placed in a certain place. Management gave an instruction and in response, Moore said, eff it, slow the bill down. That was taken as what was a work stoppage issue, which was prohibited by Section 7 of the Collective Bargaining Agreement. As a result of that, rather than Moore being initially terminated, he was terminated on July 6th of 2017, he got an opportunity. And the union and Coca-Cola Consolidated and Moore were part of a conversation in June of 2017. Where he agreed in a last chance agreement that he would be reinstated following that incident. That was something that was voluntary and knowingly. What about the allegation that there were also white employees disrupting and using foul language in the meeting and who were not punished similarly to the plaintiff here? So per the record, there was no evidence that another employee actually instigated a work stoppage, which was ultimately what Mr. Moore was terminated for on July 6th. Supposedly he said, eff it, if they want you to slow down, slow the hell down and let's get back to work. So how is that instigating a work stoppage? So according to what was reported to management in that meeting, by saying slow the bill down, the direction was not for anything to slow down by management during that pre-shift meeting. The direction was let's place this product in a different place. And so Moore interpreted that and stated to everyone in the meeting to slow the bill down. Which was the opposite of what was being instructed by management. And so that's where it was interpreted that he was actually instigating a work stoppage. And so after that he was given the opportunity to be reinstated, to be placed on this last chance agreement. And he signed it, voluntarily. As we stated, that he was an associate degree holding person, associate degree in healthcare administration, and he had a bachelor's degree. The courts have said that you don't have to be a lawyer to understand what it means to knowingly and voluntarily agree to something. There's a case, Hank versus Great Lakes, where a post high school individual was also determined to know and voluntarily agree to a release. And so he was given that agreement, the last chance agreement to sign within a period of ten minutes before he actually signed it. Or had he had time to reflect on it for days or hours before? So when the agreement was presented to him, the union representative was there. He instructed him to read the agreement. And this is per Moore's own testimony. That the union rep told him to read it. He asked questions from the union rep about signing the agreement. And then he ultimately chose to sign it that day. He did not ask for any additional time. He did not say that he wanted to consult with any attorney. He could have done so, as was testified in his deposition. But he chose to sign it relying upon what the union representative instructed him to do. The union rep is this Arrington person? Yes, Frank Arrington. Who's the vice president? My understanding is that he said, and I'm quoting from something, just sign it and get back to work. It's better to fight with a job than fight without a job. Does that suggest that Arrington was making Moore believe that he could challenge the waiver of any rights in the last chance agreement later on? So that statement from Arrington, I'm not Mr. Arrington so I can't speculate as to what he meant by that statement. But still Mr. Moore did in fact read the agreement. He could ask questions and he relied upon what Mr. Arrington instructed him to do as far as signing the agreement. And so after that, the agreement specifically stated that all prior claims, issues arising out of his employment prior to the July 2017 date would be waived and released. And so that's why those claims prior to that would be waived. So what is your best case that you would point us to to say that this compilation of factors is enough to get him out of jail? Or is it enough to show it was a voluntary waiver? I think I would point to the case that I just mentioned, the Hank versus Great Lakes case, which was a Sixth Circuit case, I believe it's 2019, but I don't have the year in front of me right now. But I think that's the best case that demonstrates that based on all of these factors, based on having representation, based on his educational background, based on all of the factors, he was instructed to read it. There was no situation where he asked for more time or anything like that. And the defendant did not deny him anything in that regard. And so he could have essentially... Had he been fired at that point? Yes. So he was terminated on July 6th of 2017, the initial termination. And then he signed the last chance and final agreement on July 14th of 2017. And he was ultimately reinstated. And just to note, the same manager, Mr. Boland, whose counsel is alleging that he was, you know, wanted to terminate him from the beginning, he's the same manager who's also signing off on his reinstatement. And so Mr. Moore is being given opportunity after opportunity, you know, once there's a violation, to again come back by the same manager. As it relates to the final termination, which was July 31st of 2018, that is based in fact. Mr. Moore, when he had an accident in March of 2017, he was then offered and agreed to, with union representation, with all parties involved, negotiated a second chance agreement. Wasn't that based on a misunderstanding of fact? That they misunderstood that the 25 nanograms was enough to fail the marijuana test, but in fact he needed 50 to fail the marijuana test. So everybody was misunderstanding the situation. And he's put on a second chance agreement. So, yes, yes, Judge Moore. You're right with respect to the testing level. Mr. Moore testified during his deposition that he had consumed some edibles around that time and he had had a workplace accident. Pursuant to the drug and alcohol policy, a workplace accident will trigger a test. When that test was given to Mr. Moore, he did test positive, as documented on the actual drug test results. There's a point, but per the... I thought positive was defined as 50 or more. So the drug test itself, which came from LabCorp, actually stated positive 25 nanograms. The drug and alcohol policy that Coca-Cola Consolidated has states that a positive test is 50 nanograms per milliliter or more of that particular substance. And so per the policy, Moore was not at that particular threshold level for a positive. However, the policy still stated that if an individual tested positive for marijuana or any other drug or alcohol in their system, that they could face immediate termination. Now Mr. Boland, who was his supervisor at that time, testified that he did not review those specific results, but he relied upon information from other supervisors that the test was in fact positive. Because he did in fact, Mr. Moore did in fact have a form of cannabinoids within his system. And so he relied upon that information. And that's where we think the honest belief rule comes in. Although, you know, it may have been... Yes, it does come in at the pretext stage. And so Consolidated has articulated that it was the fact that they relied upon the fact that there was a positive test, that it was found in his system because he admitted to consuming edibles and relied upon that information as the reason to offer him the second chance agreement. And again, Mr. Moore admitted in his testimony, in his deposition, that he knew that he would be subject to any number of drug tests for 24 months. And so that would be through 2019. Mr. Moore tested positive above the threshold level at almost 300 nanograms of... But there we get to the point that he makes that other people who happened to be white who tested positive were not terminated immediately. Right. And that is actually a mischaracterization and respectfully not factually accurate. There was a white employee named Larry Voss who was placed also on a second chance agreement just like Moore. And just like Moore, he was subject to random drug testing. Mr. Voss, by evidence that appellant provided to us, Mr. Voss had up to four random drug tests after being placed on a second chance agreement similar to Moore. Mr. Moore. And so that demonstrates... And correct me if I'm wrong, that Voss tested positive and was not immediately terminated. That it took another time for Voss to test positive for him to be terminated. Am I wrong on the facts? Yeah. On that particular area, he tested for four different times. On that fourth time, which was in September 2018, he tested positive and then he was terminated October 3rd of 2018. So less than a month thereafter. So he was in fact also terminated after testing positive for... Testing positive the first time? Yes. So he tested positive, was placed on a second chance agreement just like Moore. Moore tested positive after the accident and was placed on a second chance agreement. Voss was subjected to random testing and then also Moore was subjected to random testing. Voss was ultimately terminated based on testing positive finally and so was Moore. So the way I described it, you're saying is not accurate. That Voss did not test positive and failed to be terminated. Yes. Absolutely, Judge Moore. That's what we're saying. And actually in fact, Voss was tested after the second chance agreement had expired. And so from another perspective, he was actually treated less favorably than Moore was because he continued to be tested after the second chance agreement had expired. And none of this was based on race. It was not based on any type of protected activity. You know, I understood that the plaintiff claimed that Mr. Voss during the time he was subject to the SCA was never randomly tested during that time. Is that not correct? I understand that that's what plaintiff represented, but based on documentation that was provided to us by appellant plaintiff, Voss was tested at least four times after he was placed on a second chance agreement. And as it pertains to Wormaling, John Wormaling, who was one of the employees who passed out, he is also not a comparator for Moore. Wormaling's incident was not resulting from a workplace accident. It resulted from and how the company treated it as an emergency where an employee blacked out at work. This was not a vehicle being damaged. Wormaling fellow, he was drunk, correct? He passed out because he was drunk? Well, there was no evidence that he was actually, that he was intoxicated to any particular level. He literally just passed out at work, fell on the floor, and 911 is called and immediate medical attention was provided to him. Did they not get a, correct me on the facts, I'm sorry if I'm misrepresenting them, but I thought that it was clear that Wormaling was drunk. No, not at the time that the incident happened. He was not tested at the hospital or wherever for blood alcohol? Right, he was later, later some medical records were found where he was tested, but that information was not provided to the company. And so there's no evidence that Bolin or the other plant manager, Caressa Ford, had any knowledge that Mr. Wormaling should have been tested as a result of just passing out at work. It was treated as a medical situation and the company handled it from that aspect. And there was no other evidence in the form of testimony or anything that Wormaling was frequently under the influence of alcohol at work? There were declarations that gave a very general conclusion per appellant that Wormaling had a drinking problem, but there was still no factual evidence or testimony that Wormaling was actually drunk during that particular incident, that he tested at any levels that exceeded what would fall under the company's policy, that Ford or Bolin were knowledgeable about any of those policies at all. And so all of that combined demonstrate that there was, you know, that Wormaling was not a proper comparator in that situation. And I see my time is up, so if there are not any other questions. Thank you. Your Honor, so you're actually correct and the record is consistent with your understanding of what happened here. What counsel said is not factually accurate. Larry Voss was under a second chance agreement from June 5th of 2015 to June 5th of 2017, and he was not drug tested that entire time. Check Coca-Cola's drug testing chart, which is in the record document number 79. And then what happened is he was ultimately fired for a drug test in 2018, but that's not the positive drug test that I'm talking about. He took a post-accident drug test on May 3rd of 2017 and was not fired. And to this day, the appellee has given us zero explanation for why he was not terminated at that time. He did test positive? Yes, Your Honor. On May 3rd, 2017, Larry Voss, white employee, tested positive and was not fired at all. You were also correct, Your Honor, in your assessment that Moore's first drug test on March 28th, 2017 was not positive, according to their own policy, so he never should have been put on a second chance agreement. He was drug tested six times under his second chance agreement, whereas Larry Voss was never drug tested under his second chance agreement at all. I'm arguing that their termination of my client in July of 2018 was a pretext for discrimination, because number one, post-accident testing, which is the only reason why he was on a second chance agreement. When Worm had an accident, even if they didn't think that he was drunk, pursuant to their policy, he should have been mandatorily drug tested anyway, because he had an accident at work that was blood all over the floor, he passed out, paramedics were called, and there was a work stoppage for over an hour, and equipment fell down. That's a post-accident drug test he should have had that they didn't give him, and again, zero explanation for why they treated him differently than Mr. Moore when he had an accident. The random drug test they claimed was random, the evidence shows was not random. According to Ms. Ford, everybody that's on a second chance agreement is supposed to be drug tested, but all six times, the only person randomly drug tested was my client. As I understand it, your position is that if they're going to randomly test one person who's on a second chance, they're supposed to randomly test everyone who's on a second chance that day or whenever they're next at work? Is that the idea? Yes, Your Honor, and she said that's the policy, but you'll see, again, in the test chart, record number 79, no one else was tested ever on the same days as my client. So people tested the next day because they weren't... Not according to the chart. There's no one even in close proximity, Your Honor, looking at that record. And that's their own document based on the drug tests that are in their possession. So again, if he was fired because of a positive drug test, then why wasn't Larry Voss fired for his positive drug test? If you're supposed to be tested post-accident, then why wasn't Wyrm tested post-accident? If you're supposed to be randomly tested under an SCA, then why aren't other employees randomly tested under an SCA? The Wyrm Lurling fellow, he was taken to the hospital, so how could they have tested him right then? They do it at the hospital, Your Honor, and they have a process for that, and they never did it. And there's even evidence in the record where Ms. Ford is saying, hey, where's the drug test? They didn't do it. Those are their own emails. So they've already admitted in the record that he should have been tested. This guy was allowed to show up at work drunk repeatedly every day. We've got affidavits in the record, and I think it's important to note this is summary judgment stage. This isn't trial. So I think you can see I've brought up several issues of material fact that should have precluded summary judgment in this case. Going back to the work stoppage, you see that my client submitted two declarations plus his own testimony that he was not encouraging a work stoppage, where Mr. Boland is saying that he is. That alone is a genuine issue of material fact that precludes summary judgment, yet summary judgment was granted. With respect to him getting fired, there's no explanation in the record on their part as to why Larry Voss wasn't fired on May 3rd, 2017, when he failed the drug test. I've proven pretext with that alone. There's no explanation for why he wasn't drug tested for the two years that he was on an SCA. Again, pretext. There's no explanation for why the other three white employees that had accidents at work were never drug tested like my client. Again, pretext, Your Honor. All of these things should have precluded summary judgment. A motion for summary judgment is not supposed to be given loosely. The facts are supposed to be construed in my client's favor, and my client is entitled to a jury trial for a jury to decide these issues. Clearly there's enough evidence in the record where a jury could find in my client's favor, and the district court put themselves in the wrong spot and didn't uphold the motion for summary judgment standard. So we ask that it be reversed. Thank you both for your argument, and the case will be submitted.